Docket is the case of People of the State of Illinois v. Douglas Totty. We have Ms. Sharon Shanahan for the appellant and Donna Polinsky for the athlete. And you may proceed, Ms. Shanahan. May I please report, counsel? My name is Sharon Shanahan and I represent the people of the State of Illinois. This is a case dealing with the suppression of evidence found in the defendant's home. I think it's important to start out with what is and is not disputed. There is no dispute that the defendant was in custody and was not Mirandized and therefore his statements are not admissible. But the overarching question before this court is whether the evidence found as a result of those statements should be excluded under the fruit of the poisonous tree. Under the clear holdings of both the United States Supreme Court and our own Supreme Court, if the defendant's statements were voluntary, then the answer is most definitely no. Now, although the defendant makes a weak argument, a weak effort to argue that the United States Supreme Court's decision in Petain does not apply in Illinois, he virtually concedes that if his statements to the police were voluntary, then they were admissible. Thus, the real question is whether those statements were voluntary. Since those statements were voluntary, the trial court erred in suppressing this evidence. Now, as I said, United States v. Petain and People v. Winsett have both held that the fruit of the poisonous tree doctrine does not apply to physical evidence derived from the defendant's statements made in violation of Miranda. In the defendant's brief, he concedes this point. He says, conduct which violates only prophylactic rules does not apply, does not automatically suppress the fruits obtained. He goes on to say, where the police violate the prophylactic rules developed in Miranda, the fruit of the poisonous tree will not be applied to exclude physical or testimonial evidence derived from the defendant's statements. Finally, the defendant states, where the police violate the prophylactic rules developed by Miranda, but do not actually violate the defendant's Fifth Amendment privilege against self-incrimination, the fruit of the poisonous tree will not be applied to exclude physical evidence derived from the defendant's statements. So it sounds like we're kind of all on the same page, but despite this knowledge, the trial court fails to apply this law. The trial court mentioned neither Winsett nor Petain. It did not make any effort to distinguish either case. Instead, it's quite clear that the trial court granted the motion to suppress based on his opinion that the evidence obtained as a result of the defendant's unwarned statements had to be suppressed. Next, and this is what he said, questions concerning the location of the purchased pills led to the seizure, which led to observations of the house interior, consensual or not, which thereafter led to the search warrant. He went on to say, I don't see how I could do other than suppress the consequences of the question. So unless there are any questions on the application of Winsett and Petain, I'll move on to the more important question of the voluntariness of the statements. As our Supreme Court has said, factors in determining voluntariness include the defendant's age, intelligence, background, experience, mental capacity, education, physical condition at the time of questioning, duration of the detention, presence of Miranda warnings, the duration of the questioning, any physical and mental abuse by the police, including threats or promises. Before you go into that, where in the record or in the order do you think it's found that the court made a determination of whether it was voluntary or involuntary? I think it's implicit in the court's, that's exactly what I'm getting ready to get into. It doesn't appear to me that he felt it necessary to go into whether it was voluntary or involuntary because he thought it was fruit of the poisonous tree, stop, I don't need to go any further, and most judges do that. They stop, they don't go into issues they don't think they have to, and I don't see where he did it in this case. I think you are correct that he did not go into it, but I think it is undoubtable that it can be inferred from his statement that he found the police officers to be credible, believable, that they had made no effort to mislead the court. I have the exact language here. Isn't that the trial judge's job to do it first and for us to review it second, though? Well, if that is the case, if, assuming for the sake of argument, that you don't find sufficient evidence in this record to find that these statements were voluntary, then this court should be remanded for a hearing to determine whether those statements were voluntary. But doesn't the trial judge make that initial determination? And if we don't think he made that determination, we can't review it. We're kind of putting ourselves in the place of the trial judge if we're deciding whether it was voluntary or not. Well, what you're looking at at this point in time is not the court's, assuming that you have read the record, that you're looking at pieces of the trial court's determination. And, again, if that's what you think, then you need to remand this for another hearing. Right. But I think that that can be inferred. It seems to me that... It's only by inference. There's nothing explicit that he made this determination or relied on that making his decision. It seems to me... The way I read the record is that he's saying, you know, you didn't do anything wrong as far as what you did, but you questioned him after Miranda. And that's undone. But he doesn't just say it that briefly. It's that brief in our briefs. But he does talk quite a bit in his order. And I think that the conclusion here is that he would have to find that the police officers were not telling the truth in order to find that the defense statements were not voluntary. And that the trial court's language clearly indicates that he did not think that. As far as the application of the voluntariness test, I would note that in this particular case, the defendant was standing in his driveway, his own driveway, outside his house. It's the middle of the day. His brother was with him. He was a fully capable, coherent 60-year-old man. He was only asked three questions. Although there were other officers in the general area, there were only the two near him. They were the only two that were involved in questioning him. Neither officer threatened, coerced, or promised the defendant anything. No guns were drawn. The defendant very... And I think this is a very important point. The defendant clearly knew he could refuse, since later on when they asked him for consent to search his house, he said no. So he knew he could do it. So I don't think there's any doubt that although the defendant was unwarned, his statement was voluntary. Again, I think this evidence supports that conclusion. The next thing that we need to talk about is whether the search, which ultimately resulted from this, was properly obtained and executed. Now, it's undisputed that the defendant purchased pseudoepidermic pills the day of the arrest. He said that, and the police officer said that. It's also undisputed that the defendant told Agent Fisher that the pills were inside the residence in a cabinet above the kitchen sink. Let me ask you one question. A box of pills, now that doesn't mean more than like 24, 12. How many were in the... Is that in the evidence? If you'd go into a drugstore and you had a bad cold, you'd normally purchase a box of pills. Or is this bigger? From the definition, I don't know. Your Honor, I don't know either. I don't know whether you noticed or not, but I didn't write the opening brief in this case. And I don't know the record in this case as well as I normally do. I would know, however, that this was the third time that this defendant had bought pseudoepidermic within the last couple of weeks. But there was only one box. True. Which would be normal. Boxes can be, as far as I know, up to about 48 pills. Oh, really? But... The police were alerted by a call from the pharmacy? From the pharmacy, yes, because this defendant had a history of this. So, yeah, it wasn't an out-of-the-blue question. But my understanding in the brief, I thought it said it was like three months apart or how far? No, no, within the month. Oh, two purchases within the month. Two other purchases. Okay. Within the prior month. Oh, I thought it was only one and it was farther apart. No. So, the other thing is, well, let's get, let me, if I can regress a minute here. Did the defendant tell the police officers that they could go in and get that box of pills? Because I think that's really what it comes down to. Agent Fischer and Agent Patterson both testified that Fischer asked the defendant if he could go inside and get the pills from the cabinet, and the defendant gave Fischer permission to do so. He gave permission for him to do so only after he told him he didn't want him to go in and he said, I'm going in. And then he said something along the lines, well, I want, was it his son to accompany? Brother. Brother to accompany. Well, if you believe the defendant's side of the story, yes, we have a credibility determination. No question about it. We have two police officers that testified that he did give them consent. We have the defendant who said that actually the defendant's brother did not testify. His son did. I think that's right because I was looking for that this morning. I don't believe the brother testified, but the defendant testified that, just what you said, that he said, no, you can't. And the police officer said, well, I'm going in anyway, and then he told his brother to go in. So you have the brother and the defendant saying you can't. You have a police officer saying you can. No. It is my recollection of the record that the brother's defendant did not testify. Okay. His son testified. And said? That he heard his father say no, but the evidence also indicates, well, first of all, at the time his son supposedly heard this, he was sitting in a police car. And there is no question that after they came out after seeing the alcohol and the hydrogen peroxide alongside that, that they came back out and they asked him for permission to search his car. And what was the finding of fact of the judge in that? Who did the judge believe? See, the judge never gets to that point. He just said you can't, everything after Miranda is gone. And how can we review it if the judge didn't decide? Well, as I said, you have to either look at the evidence that is there, that clearly supports the decision, or you have to remand and say throughout court you were wrong in deciding that this was suppressed because of Miranda. You have to now make a finding as to the credibility of these witnesses. So that would be the only other alternative. But here's the language that I think is very important for this court to consider. The trial court, and this is a quote, he found no reason to believe that there was any artifice or thought of artifice in this encounter or deception on the part of the police. That means, to me, he felt like the police were telling the truth. He didn't then go on to rule on whether or not this was voluntary or not because he said that doesn't matter. But he still said it. He said there is no artifice in the police officers. Artifice means lying. The police officers didn't lie. The police officers said they had consent to enter that home. I think it's important to note also that no one claims that Officer Fisher even remotely wandered from the very narrow consent that the defendant granted, which is to walk directly from outside the house to the kitchen cabinet and back outside. His brother went with the police officer. If there was any question whether the police officer was out there wandering around looking for things, the defendant's brother was there with him. The defendant doesn't claim that. Nobody claims that. Nobody claims that the police officer did anything other than that. But Ms. Shanahan, if the court was not considering the issue of whether or not there was a consent to enter, then it would have been even improper for him to comment on whether or not there was any artifice. I mean, don't we presume, and wouldn't it be wholly appropriate for us to consider that comment with respect to the original issue? Well, there's really only one issue here, which is… If we're talking about the poisonous tree and we don't go beyond that because the judge didn't go beyond that, why would the judge be commenting about whether or not the police were truthful with respect to consent to enter? The trial court's language indicates that he is bound by this. Again, I'm putting words into his mouth, but he kind of indicates that even though he didn't do anything wrong, Miranda requires this. But he does make… I mean, he did make that finding. I don't know how you can ignore that finding. I don't think it was wrong for him to make that finding, but I don't think it was not necessary for his ultimate finding. But he did make that finding. He did make the finding that the officers had lied. And if the officers didn't lie, then it sort of seems like a waste of judicial resources to have that trial court say the same thing in a different context, which is, okay, I was wrong about Miranda. The officers didn't lie. Therefore, he did give consent. Whether he needed to make that statement, whether he should have made that statement is rather immaterial. He sat there and listened to the police officers. He sat there and listened to the defendant. He said that he found no artifice in the police officers. The police officers did not lie. I don't think I even want to wander into the few other points that we have here because they're rather inappropriate. The most I would say is that there was probable cause. Assuming that you get to the first point, which is the police officers didn't lie, then they did have permission to enter the house. They did find the pseudoepigrine. They did see, but not seize, the isopropyl alcohol and the hydrogen peroxide. The sworn affidavit, which accompanied the warrant, noted how isopropyl alcohol and hydrogen peroxide are used to manufacture methamphetamine. The affidavit noted that the defendant is a regular at the pharmacy, where he has frequently purchased pseudoepigrine, and that the defendant had purchased pseudoepigrine twice in the month preceding his most recent purchase. The defendant admitted that he had bought pseudoepigrine that day. When you put all those things together, there certainly was probable cause. Was there any, there was nothing else? No other plastic bowls, no bottles, no cooking? No. Because most medicine cabinets have those three things, probably. Until after this case, maybe. At this point, we're dealing with probable cause for the search warrant. I know, I know. Not proving that he made it. That might be yet another question altogether. Is there any other questions? Thank you, Ms. Jamihan. You'll have the opportunity to rebut Ms. Walensky. Thank you, Your Honors. May it please the Court. Your Honors, first and foremost, I don't believe we're exactly on the same page. The defense does not concede the State's argument. What we have conceded is the resuscitation of the case law that they cited in their lengthy, lengthy brief is accurate. The main thing in Patain and Winsett is that it is not, roots of the poisonous tree are not automatically suppressed as statements are automatically suppressed if they are unworn statements when a defendant is under arrest. The fruits can be suppressed or they can be admitted into evidence, depending on the facts and circumstances around the questioning, around the way the evidence was gained. Whether it's physical evidence, whether it's witnesses that are found, those are questions of fact for the trial court to determine whether those physical fruits, those witness fruits, so to speak, are admissible at trial. The trial court didn't apply Patain and Winsett, nor did it distinguish either case. And one could infer that that's because those cases are monumentally different from this case. In Patain, the defendant was arrested for harassing his ex-girlfriend and was released on bond with the TRO. During the investigation or during that arrest process, the ATF officer learned that the defendant, the convicted felon, had a gun in his home, came to the home, began to Mirandize the defendant, and the defendant said, I know my rights, told him where the gun was. That's not even close to what we have here. We have the defendant being brought out of his house by his brother with at least 10 officers in front of him in his front yard. He was arrested. He was arrested on a traffic stop. And it's also important to note in the record that defendant's son was also detained down the road a bit coming home. The officers pulled him over thinking he was his father. Now, the pretext, it appears that the pretext of all of this was the traffic stop so that they could investigate the meth manufacturing or potential meth manufacturing. Nowhere in the record did they indicate to either the defendant's son when they pulled him over or the defendant himself or his brother that he was being investigated for meth manufacturing. I thought there was a warrant. The warrant was obtained later, after the officer went into the home and obtained the pills, which that brings me to another point, and I apologize I'm jumping around, but this was a medicine cabinet. Although it may be unusual that this medicine cabinet was in the kitchen, it was labeled as a medicine cabinet. I don't know about you, but I do have alcohol and hydrogen peroxide in my medicine cabinet. So if I go purchase pseudoephedrine, does that mean? What do you mean it was labeled as a medicine cabinet? Labeled by whom? Well, the defendant said it was in my medicine cabinet. The officer asked, Where's the medicine cabinet? He told them the medicine cabinet was in the kitchen. Now, it's realistic to believe that the defendant, who at this point was handcuffed, standing at his car, also the defendant's son was brought to the home in a police car also. So he was at the home. He was allowed to leave at some point during this time before the defendant was taken to the police station, and he went back and got his vehicle that he had been pulled over in. So the defendant sees all these officers, told he's under arrest for a traffic stop, and then he's going down to the City of Collinsville Police Department. His son is pulled up in a police car, and the officer wants to go in the home because of this purchase of pseudoephedrine. The defendant's testimony in the motion to suppress was that he told him no, and he hollered at the officer as the officer still went inside, Go with him, Donald. That's his brother's name. So his brother went inside with him. It's very realistic to believe that had the defendant been Mirandized and said you're under arrest for suspicion of manufacturing for your purchase of pseudoephedrine, the defendant would have refused everything. He was not Mirandized. He cannot give a voluntary statement based on the facts that are in this case. He was in custody. He was handcuffed. He was being interrogated. Yes, it was not at a police station, and it wasn't his front yard. However, it's still intimidating to an individual to have all these officers around you, your son in a police car, your brother being told, he also told his brother, lock the house. Let me ask you this now, back to what we talked about with the state. Did the trial judge make a determination whether the statement was voluntary or involuntary? I believe so, but that is reading the order, and it is interpreting. The trial court finds at the time of questioning in this matter, the defendant was in custody. As such, he was entitled to constitutional right appropriate Miranda warnings. The judge indicated that it didn't matter that he was being arrested on another matter. He was being questioned for a criminal charge. But that doesn't come in on the voluntariness, does it? No. I mean, on the second page, he's got no matter how good their intentions. Right. I mean, that doesn't kind of infer voluntary or involuntary, if anything, voluntary. Well, their intentions would be the police officer's intentions, whether the intentions are voluntary. Right. The officers were to try to get the defendant, to coerce the defendant or commit some sort of inappropriate conduct to get him. The judge could properly consider the intentions of the police officers in determining whether it was voluntary. That's correct. Based on the order, I believe that the judge felt that it was involuntary because he does make a point to put in the order that the defendant was in custody. The defendant was in custody for another matter, but questioned on a more serious matter, obviously. And that he indicated the rules were clear. Arrested defendants must be warned defendants for valid questions to follow. So you're saying if you're in custody and you're not given Miranda, it's involuntary? Not necessarily. Right. There are, for instance, the Petain case. He was given his Miranda warnings, but he weighed them off and talked to the officers. If a defendant is not given his Miranda warnings and the officer says you're under arrest for whatever the case may be, and he says, okay, fine, I did it, or whatever the case may be, I'd like my attorney. Something to that effect, Miranda may or may not be given. If the defendant, after interrogation, after that point, makes statements, they would be involuntary. According to all of the case law that's been cited in these briefs, the distinguishing factor between voluntary and involuntary is a very gray line. It's the totality of the circumstances that the trial court sees. To rule in your client's favor or to not sustain the state's appeal, would we have to decide that the court found that your client's statements were involuntary? I don't believe so. I believe that the court indicated that the defendant should have been Mirandized. Because he was not Mirandized, any questioning that followed was a violation of his Fifth Amendment right against self-incrimination. Even if it was voluntary? Based on the facts that the judge sought at that time, yes. However, if the statements were voluntary, I believe, yes, you'd probably have to remand this if you wanted a clear definition of voluntary versus involuntary from the trial court. But, again, with the trial court, you had touched upon this in counsel's argument that the court was a better judge of the credibility of all of the witnesses, the testimony of the officers. The judge did also, in the transcript, state that courts over the years have put all kinds of orchestrated, hyper-technical rules on arrests and searches done by police officers. I think it is an undue burden, and it has gone to extremes. The court superior to this one have also indicated that essentially, and he quoted, rules is rules. I have to see how these rules are, and they have, I'm sorry, I have to see how these rules that they have structured apply to these circumstances, basing it on the facts at hand that the trial judge sought. One thing that counsel stated was that defendant clearly knew he could refuse to answer the officer's questions because later he refused search of the home. I don't believe that to necessarily be true. He was told he was under arrest for outstanding traffic violations. He was not told he was under arrest for his purchase of pseudoephedrine and that he was being looked at for meth manufacturing. It's also important to note that the trial court had all of the evidence in front of them. There was a burn pit in the backyard. No meth chemicals or residue found. Nothing in the home had any residue or any indication that there had been any meth manufacturing going on. The only thing was the things in the medicine cabinet that the officer saw when he walked into the defendant's kitchen. The credibility comes into play, and although the trial court did not state that the police officers were telling the truth and the defendant and his son were lying, he merely stated that, in a nutshell, the officer's job is hard at this point. You've been told by so many different agencies and courts and rules have changed and more have been put in place that your job is difficult. It doesn't mean that the defendant's rights are not violated because the officers might have a tough job in that particular instance. It seems that the officers would be more diligent in that particular situation because they know the rules are hypersensitive and technical and have changed. Maybe they go beyond the normal to err on the side of caution so that their case does not get found out once it comes to the trial court level. Are there any other questions? That's all I have. Thank you. There was a warrant when the police officers went to this house. It wasn't for meth, but there was a warrant. They did have a reason to arrest him, so they didn't just show up here out of the blue. What was the warrant? I knew you were going to ask me that. I think it was he hadn't showed up. Right, for non-appearance. For not appearing. Well, the trial counsel just said it was a traffic offense, but there was a warrant out for his arrest. In fact, that's why one of the two police officers went there. The other one went there because he'd gotten this notice from Walmart. But they all knew he was good for the job, so to speak. He had prior meth manufacturing conviction. I'm pretty sure he did. I think so, yes. And that they'd been to his house before in regards to methamphetamine investigations in the brief. True, but still, I'm saying they went there. At least one of the police officers was aware of the warrant, went there, and arrested him on that warrant. So there was a warrant. It wasn't like all of this happened just out of the blue. One of them most definitely did go there because of the suspicions about meth. So I just wanted to make that. The defendant attempts to distinguish Winsett and Petain by going into a long recitation of the facts in Winsett and Petain. But we need to look at the holdings of Winsett and Petain. Winsett says, and I quote, Where the police violate the prophylactic rules developed in Miranda, but do not actually violate the defendant's Fifth Amendment privilege against self-incrimination, the fruit of the poisonous tree doctrine will not be applied to exclude physical or testimonial evidence derived from the defendant's statements. And Petain, we did not have a majority, but there is, under the plurality, which has been accepted as the true holding of the court, even under the minority, too. Under Petain, the United States Supreme Court has indicated, Failure to give Miranda warnings does not act as a bar to admissibility of the fruits of unworn statements taken during custodial interrogation so long as the statements are voluntary. So, and then like I said, I read through all of those statements that are in Defendant 3. Defendant is attempting to impose a restriction on Petain and Winsett, which simply does not exist. It doesn't matter whether this warrant was for meth or whether it was for failure to appear. The state concedes the point that Miranda should have been given, were not, and his statements were inadmissible. That's the constitutional violation that occurred here, was a violation of Miranda. The question deals only with whether the statements that the defendant made were voluntary and true. So, in reviewing this record, you have to determine whether the trial court definitely found the police officers truthful. Again, I think if you look in a dictionary, you'll find that the definition of artifice is falseness, lying, untruth. Since he found no artifice, to me, that means he found those police officers truthful. If the police officers were telling the truth, then the defendant did give them consent to enter the house. And everything that followed from there was appropriate for the execution of the search warrant. If you don't find sufficient evidence in the trial court's order to find that he did determine who of the two sides was truthful, then I think the only thing you can do is remand, probably better tell this judge about Petain and Winsett, and order him to make up a factual finding about the credibility of the witnesses. Is there any other questions? Thank you, Ms. Shanahan. Thank you, Florence. We'll take the matter under advisory command of the ruling.